UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Ashley Barton, individually,
and o/b/o KJB, a minor,                    Case No. 25-cv-00033 (LMP/DLM)

            Plaintiff,
                                           **First Amended Complaint**
v.

Mayo Clinic, Peter S. Rose, M.D.,          **Jury Trial Demanded**
and Syed Mohammed Karim, M.D. a/k/a
Mohammed Karim, M.D.,

            Defendants.

For her First Amended Complaint individually and on behalf of her minor

daughter KJB, Plaintiff Ashley Barton hereby alleges the following upon knowledge,

information, and belief:

## Introduction

1.      Thirteen-year-old KJB walked into the Mayo Clinic but rolled out in a

wheelchair, paralyzed from the waist down, as the result of medical malpractice. KJB,

despite presenting with scoliosis and a spinal tumor, was neurologically intact and fully

functional prior to undergoing surgery at Mayo Clinic. Prior to, and following a series of

spine surgeries, Defendants Dr. Rose and Dr. Karim failed to implement necessary

stabilization measures to prevent spinal instability, leaving KJB vulnerable to

catastrophic spinal cord injury. Defendants' collective failures to follow standard

protocols for stabilization in light of KJB's pre-existing spinal abnormalities directly

caused KJB to suffer complete paraplegia, robbing her of the use of her lower body and

permanently hindering her quality of life. This Complaint seeks to hold Defendants accountable for their negligence, which has resulted in devastating and irreversible harm to KJB and her family.

## Parties

2.      KJB was thirteen years old during the surgical procedures addressed in this Complaint.

3.      Ashley Barton ("Plaintiff") is KJB's mother.

4.      Plaintiff and KJB (along with KJB's father and Plaintiff's husband) reside in North Dakota and resided in North Dakota at all relevant times. They were citizens of North Dakota at all relevant times and are citizens of North Dakota today.

5.      Defendant Mayo Clinic ("Mayo") is a nonprofit domestic corporation created under the laws of the State of Minnesota.

6.      Mayo's principal place of business is located at 200 First Street Southwest, Rochester, Minnesota 55905.

7.      Mayo was a citizen of Minnesota at all relevant times and is a citizen of Minnesota today.

8.      Peter S. Rose, M.D. ("Dr. Rose") is and was at all relevant times an orthopedic surgeon at Mayo, specializing in orthopedic oncology and pediatric orthopedic surgery.

9.      Dr. Rose was at all relevant times a Mayo employee acting within the course and scope of his duties at the Mayo.

10. Dr. Rose resides in Minnesota and resided in Minnesota at all relevant times. Dr. Rose was a citizen of Minnesota at all relevant times and is a citizen of Minnesota today.

11. Syed Mohammed Karim, M.D. a/k/a Mohammed Karim, M.D. ("Dr. Karim") was at all relevant times an orthopedic surgeon at Mayo, specializing in spine surgery and orthopedic oncology.

12. Dr. Karim was at all relevant times a Mayo employee acting within the course and scope of his duties at Mayo.

13. Dr. Karim resided in Minnesota and was a citizen of Minnesota at all relevant times.

14. Dr. Karim resides in Maryland and is a citizen of Maryland today.

15. Mayo is vicariously liable for the acts and omissions of Dr. Rose, Dr. Karim, and its other employee medical providers identified in this Complaint.

16. Mayo, Dr. Rose, and Dr. Karim are collectively referred to herein as "Defendants," unless otherwise indicated.

## Jurisdiction and Venue

17. This Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a), based on the complete diversity of citizenship between the parties and an amount in controversy in excess of $75,000.00, exclusive of costs and interests.

18. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions occurred in Minnesota.

**Factual Background**

**A.  Dr. Rose failed to make and/or implement a pre-surgical plan to addresses KJB's likely spinal instability following the Stage One and Stage Two surgical procedures.**

19.     After the discovery of a curvature in her spine during a routine softball health check, KJB was diagnosed with scoliosis secondary to a left-sided paraspinal and intraspinal tumor, i.e., a tumor existing both alongside and inside the spinal column, causing KJB's spine to curve.

20.     KJB was neurologically intact at the time of the original diagnosis, i.e., KJB had no nerve or spinal cord damage or problems with movement, sensation, or bodily functions controlled by the nervous system.

21.     KJB was referred to Dr. Anthony A. Stans ("Dr. Stans") for consultation and possible treatment.

22.     Dr. Stans is a pediatric orthopedic surgeon at Mayo.

23.     Dr. Stans conducted a video consult with KJB's parents on September 19, 2023.

24.     Dr. Stans charted during this virtual visit that KJB was "entirely asymptomatic" with respect to the scoliosis and tumor.

25.     Put simply, KJB could and did engage in the typical physical activities of a healthy teenager.

26.     KJB, for example, was playing competitive softball.

27.     Prior to the September 19, 2023 consultation, Dr. Stans consulted with Dr. Rose due to Dr. Rose's expertise in orthopedic oncology.

28.     Dr. Stans recommended and made arrangements for KJB to be seen at Mayo for biopsy, MRI, CT scan, and orthopedic oncology testing and consultation.

29.     Nine days later, on September 28, 2023, Dr. Rose met KJB in person for the first time at Mayo.

30.     Dr. Rose found KJB to have no neurologic deficits during this initial examination despite the tumor pressing against her spinal cord.

31.     Dr. Rose's assessment was consistent with Dr. Stans' finding that KJB was neurologically intact and asymptomatic from the spinal tumor.

32.     Following this consultation, Dr. Rose ordered a biopsy of the tumor.

33.     The biopsy performed on September 28, 2023, identified the tumor as a ganglioneuroma—a benign tumor that originates from the autonomic nerve cells.

34.     Following the biopsy, a femoral vein clot was also discovered.

35.     KJB was diagnosed with an anticoagulation disorder—a condition that could affect the body's ability to control blood clotting.

36.     Dr. Rose recommended two-to-three months of anticoagulation treatment of the femoral vein thrombosis prior to commencing any surgery to remove the tumor.

37.     On or around October 12, 2023, Dr. Rose recommended a three-stage surgery to address KJB's intrathoracic and intraspinal ganglioneuroma.

38.     "Stage One" was intended to be a posterior removal of the intraspinal portion of the tumor, i.e., the part of the tumor located inside the spine was to be surgically removed via an incision in the middle of KJB's back at the thoracolumbar region.

39.     "Stage Two" was a thoracoabdominal approach to remove the remainder of the tumor, i.e., the tumor was to be removed by a lateral (side) approach through a surgical incision made in both the chest and abdominal areas.

40.     Stage Two was intended to occur 2-4 days after Stage One.

41.     "Stage Three" was a surgery to correct KJB's scoliosis.

42.     Dr. Rose was tasked with Stages One and Two.

43.     Dr. Stans was tasked with Stage Three.

44.     At the time of the October meeting, Dr. Rose referred to this as a "tentative plan" and informed KJB's mother that he would confer with Dr. Stans to "finalize a more complete plan."

45.     Dr. Rose's plan put KJB at a high risk for spinal instability because of the nature of her spinal abnormality (i.e., scoliosis and deformity of the T11-T12 vertebral elements) in relation to the tumor and the likely need for resection (i.e., removal) of critical spinal anatomy to achieve complete tumor resection.

46.     This high risk of spinal instability put KJB at high risk for paralysis and/or death if not properly accounted for and addressed intraoperatively and/or perioperatively (i.e., during the surgery and/or after the surgery).

47.     Dr. Rose's plan did not address the critical need for stabilizing the thoracolumbar region in order to adequately protect KJB's spinal cord from injury due to instability.

48.     Dr. Rose knew, or should have known, this plan put KJB at high risk for spinal instability and resultant spinal cord injury.

49.     Dr. Rose pursued this surgical plan.

50.     Prior to the surgeries, KJB underwent CT and MRI scans.

51.     The January 29, 2024 CT Scan showed a significant left intrathoracic and intraspinal tumor at the thoracolumbar junction, with thoracolumbar scoliosis, deformity of the both T11-T12 facet joints, deformity of the left T11-T12 foramen, rotatory subluxation, invasion of tumor into both the T11 and T12 vertebral bodies, and displacement of the spinal cord to the right side of the spinal canal at T11-T12.

52.     The January 29, 2024 MRI Scan showed that KJB had a large intrathoracic paraspinal and intraspinal neurogenic tumor originating from the left T11-T12 foramen, i.e., a tumor located inside and near the spine in the chest area, that extended through the opening between the 11th and 12th thoracic vertebrae on the left side.

53.     Dr. Rose met with KJB and her parents on February 2, 2024, to make final preparations for surgery.

54.     Stage One was scheduled for Monday, February 5, 2024.

55.     Stage Two was scheduled for Wednesday, February 7, 2024.

56.     Stage Three was scheduled to occur on February 15, 2024.

57.     Dr. Rose specifically charted that the purpose for the Stage Three procedure was for Dr. Stans to correct KJB's scoliosis.

58.     KJB was scheduled to remain in the hospital until all three stages were completed.

59.     Dr. Rose did not warn KJB or her parents about the increased risk of paralysis or death from a surgical plan that lacked stabilization measures to prevent spinal instability.

60.     At no time pre-operatively did Dr. Rose assess or document his assessment of the potential for instability at KJB's thoracolumbar junction prior to, or as a result of, his planned tumor resection.

61.     At no time pre-operatively did Dr. Rose implement or document the implementation of a plan to ensure for the stabilization of KJB's thoracolumbar region and protection of her spinal cord prior to the Stage Three procedure.

62.     The standard of care required that Dr. Rose recognize the likely instability of the spine related to the tumor and tumor resection, create a plan to ensure the stability of KJB's thoracolumbar region concurrent with the resection of the tumor, and protect KJB's spinal cord from injury related to instability.

63.     The standard of care also required that Dr. Rose create a plan to protect KJB's spinal cord from injury due to instability by surgically stabilizing KJB's thoracolumbar region during the Stage One procedure, or through bracing and enforcement of strict spinal precautions perioperatively.

64.     Dr. Rose violated the standard of care and put KJB at an unreasonable and unnecessarily high risk of permanent paralysis or death by not creating such a plan to appropriately stabilize the thoracolumbar region of KJB's spine during the Stage One and/or Stage Two procedures or through bracing and enforcement spinal precautions perioperatively.

65.     To the extent Dr. Rose consulted with one or more Mayo doctors and those doctors did not recommend creating a plan to appropriately stabilize the thoracolumbar region of KJB's spine during the Stage One and/or Stage Two procedures, those doctors also violated the standard of care while working within the course and scope of their employment with Mayo.

**B.      Dr. Rose breached the standard of care by failing to stabilize KJB's spine following the Stage One and Two procedures.**

66.     On February 5, 2024, Dr. Rose performed Stage One, which included removal of the tumor from the spinal canal.

67.     The tumor removal required a complete left facetectomy of T11/12, complete laminectomy of T11, partial laminectomy of T10, and hemi-laminectomy of T12.

68.     A complete left facetectomy of T11/12 is the removal of the entire left facet joint between the T11 and T12 vertebrae.

69.     A facet joint is a small stabilizing joint located between and behind adjacent vertebrae in the spine; there is one facet joint on each side of each level of the spine.

70.     Facet joints are critical anatomic structures that contribute to the stability and strength of each level of the spine.

71.     A complete laminectomy of T11 is the removal of the entire lamina at the T11 level of the spine.

72.     The lamina is a portion of the vertebral bone that covers the dorsal (i.e., posterior) portion of the spinal canal.

73.     A partial laminectomy of T10 is a surgical procedure involving the removal of part of the lamina of the 10th thoracic vertebra.

74.     A hemi-laminectomy means that one side of the lamina was removed.

75.      In sum, Stage One required the removal of KJB's facet joint, multiple laminae and other spinal structures, which put KJB at high risk for spinal instability and spinal cord injury at the thoracolumbar region of her spine, particularly when viewed in combination with her pre-existing scoliosis and deformity at the T11-T12 region.

76.     At no point during Stage One did Dr. Rose perform any surgical procedure to stabilize the thoracolumbar region of KJB's spine.

77.     Dr. Rose violated the standard of care by not surgically stabilizing the thoracolumbar region of KJB's spine during Stage One.

78.     Since Dr. Rose did not surgically stabilize the thoracolumbar region of KJB's spine during Stage One, Dr. Rose further violated the standard of care by not putting post-surgical spinal precautions in place or post-surgically bracing KJB's spine with an orthosis to protect the stability of the thoracolumbar region of KJB's spine.

79.     Immediately following Stage One, KJB remained neurologically normal.

80.     Dr. Rose performed Stage Two on February 7, 2024, which included the lateral approach for the resection of the left chest/paraspinal portions of the tumor.

81.     This required a thoracotomy and partial removal of the 11th and 12th ribs.

82.     A thoracotomy is a surgical procedure in which an incision is made through the chest wall to gain access to the organs inside the chest.

83.     During Stage Two, Dr. Rose also observed that the tumor was infiltrating into the vertebral bodies of T11 and T12.

84.     Dr. Rose removed the portion of the tumor that was infiltrating into the vertebral bodies.

85.     Stage Two further destabilized the thoracolumbar region of KJB's spine through the partial removal of the 11th and 12th ribs and the removal of the tumor that was infiltrating into the vertebral bodies.

86.     Dr. Rose violated the standard of care by not surgically stabilizing the thoracolumbar region of KJB's spine during Stage Two.

87.     Notably, while Dr. Rose should have stabilized the spine during Stage One, he had another opportunity to do so again during Stage Two, since he reopened the posterior incision from Stage One during Stage Two.

88.     Since Dr. Rose did not surgically stabilize the thoracolumbar region of KJB's spine during either Stage One or Stage Two of the procedure, Dr. Rose further violated the standard of care by not ordering any post-surgical spinal precautions or stabilizing KJB's spine post-surgically with an orthosis to protect the stability of the thoracolumbar region from instability.

89.     In the absence of surgical stabilization, spinal precautions, and/or bracing, KJB was at high risk of permanent paralysis and/or death due to the instability of the thoracolumbar region of her spine resulting in injury to her spinal cord as she underwent progressive postoperative mobilization and physical therapy.

### C.     Transient Paraparesis on February 10, 2024.

90.     At approximately 10:00 a.m. on the morning of February 10, 2024, KJB was experiencing no pain and completed her prescribed physical therapy.

91.     KJB rated her own pain level at 0/10.

92.     At approximately 10:15 a.m., nursing staff assisted KJB from a seated position back to her bed.

93.     KJB stood with minimal assistance for the move, but as she pivoted and began sitting on the edge of her bed, she felt a pop, collapsed to the floor, screamed in pain that something was wrong, lost all feeling in her legs, and experienced extreme pain she described as 10/10.

94.     Simultaneously, KJB lost control of her bladder and urinated on herself and on the floor.

95.     Nursing staff and KJB's parents assisted in boosting KJB back onto the bed and laid her down.

96.     For the next several hours, KJB continued to experience severe spinal and lower extremity pain at levels of 9/10 and 10/10 in addition to weakness and pins and needles sensations in her legs into the early evening.

97.     KJB's neuropathic pain, urinary incontinence, loss of sensation and strength, were consistent with a transient paraparesis (i.e., temporary loss of neurologic function in the lower extremities and bladder) directly caused by the post-surgical instability of her spine that Dr. Rose had failed to address.

98.     KJB's transient spinal cord injury was the direct result of her being mobilized with an unstable spine.  The action of bending and twisting directly injured KJB's spinal cord because her spine was unstable and unable to protect the spinal cord from injury due to the abnormal impact of bone and soft tissue when she moved.

**D.     The February 10, 2024 CT Scan revealed acute findings at the disc space that were indicative of instability at the T11-T12 Region, after which KJB was placed on spinal precautions.**

99.     KJB's mother strenuously advocated for KJB to undergo a CT Scan of her spine due to the continued pain and neurological symptoms KJB experienced on February 10, 2024.

100.     Fellow Paul J. Gagnet, M.D. ("Dr. Gagnet") ordered the CT scan on the evening of February 10, 2024, and it was performed at 9:28 pm that evening.

101.     Dr. Amy B. Kolbe, M.D. ("Dr. Kolbe") interpreted the CT scan that evening and compared it to the pre-operative CT scan from January 29, 2024.

102.     The CT scan of February 10, 2024 revealed several key findings consistent with acute spinal instability.

103.     The CT scan revealed "new disc space widening between the T11 and T12 vertebrae" and "focal levocurvature at this level, increased since prior (CT scan)," indicating a new disruption in the alignment and stability of KJB's spine.

104.     In addition to the "new disc space widening," the CT scan also revealed an intervening linear osseous hyperdensity (i.e., a dense, line-like area consistent with bone) at T11-T12, which Dr. Kolbe recognized "may represent displaced fracture of the

T12 superior endplate" — further indication of acute compromise of the structural integrity of KJB's spine.

105.    The above "new" findings on the CT scan of February 10, 2024, were not present at the time of either of the surgeries of February 5 or February 7, 2024.

106.    The above "new" findings discovered on the CT scan of February 10, 2024, are not consistent with routinely-expected, post-surgical findings following tumor resection surgeries such as KJB's on February 5 and February 7, 2024.

107.    The above "new" findings discovered on the CT scan of February 10, 2024, are the result of acute traumatic injury to the T11-T12 region of KJB's spine, which occurred sometime after the surgery of February 7, 2024.

108.    Dr. Kolbe opined that "[a]n **unstable spine** in the context of left facetectomies **should be considered**."  (emphasis added).

109.    KJB's spine was predictably unstable, as the CT scan findings confirmed the acute and progressive instability at T11-T12 which occurred earlier that day.

110.    Dr. Kolbe charted that she discussed her findings with Dr. Gagnet.

111.    Neither Dr. Kolbe nor Dr. Gagnet appear to have charted any further substance of their conversation with one another following Dr. Kolbe's CT scan interpretation.

112.    Resident Sam Broida, M.D. ("Dr. Broida") charted at 11:42 p.m. on the evening of February 10, 2024, that the "CT was notable for increased gapping at the low thoracic interspace."

113.    Dr. Broida also charted that KJB "feels her paresthesias have improved since this morning.  On exam, she is fully sensate in the bilateral lower extremities."

114.    Dr. Gagnet ordered strict bedrest with spinal precautions and log rolling at 10:47 p.m. on February 10, 2024.

**E.    Dr. Rose breached the standard of care by failing to recognize KJB's acute instability and removing KJB from spinal precautions.**

115.    Dr. Gagnet rounded on KJB at approximately 10:30 a.m. on the morning of February 11, 2024.

116.    Dr. Gagnet charted, in relevant part, that: "The pins and needs [sic] feeling in her bilateral lower extremities has resolved….We did obtain CT chest, abdomen and pelvis to evaluate both the bony anatomy, as well as the soft tissue anatomy and reviewed the CT scan with Dr. Rose.  There are no concerning findings.  She was on bedrest overnight with spinal precautions until we were able to review the CT this morning."

117.    Shortly after Dr. Gagnet met with KJB and her parents, Dr. Rose met with them at approximately 11:00 a.m.

118.    Dr. Rose charted, in relevant part, "She had a difficult day yesterday.  She was doing great, but then felt a pop and there was concern about some potential dysesthetic pain arising in her lower extremities in the setting of a normal motor examination.  Dr. Gagnet and others visited with her.  I was unfortunately not in the area, but was in full communication.  We got a CT scan that I have had a chance to personally review, and I am not concerned about the findings…"

119.     Neither Dr. Rose nor Dr. Gagnet documented KJB's episode of urinary incontinence on February 10, 2024, although it was documented in the chart by KLB's nurse, and by the orthopedic intern, Marisa Ulrich, MD.

120.     Dr. Rose documented that "[t]oday, her legs feel fine and strong beneath her, but she obviously has some anxiety about things….Today, we are going to focus on just pain control and resuming mobilization."

121.     At the instruction of Dr. Rose, Dr. Gagnet discontinued all spinal precautions and restrictions and ordered KJB to be "up ad lib," which means she was free to move with no restrictions.

122.     Dr. Rose violated the medical standard of care by: (a) failing to recognize that KJB's transient paraparesis was caused by the acutely progressive instability of KJB's spine; (b) removing KJB from spinal precautions; (c) not promptly performing surgical stabilization of KJB's spine; and (d) not bracing KJB's spine with an orthosis, should he have wrongly declined to surgically stabilize KJB's spine.

### F.     Dr. Rose and Dr. Karim caused and/or significantly increased the risk of KJB's incomplete and then complete paraplegia by their violations of the standard of care.

123.     Due to her pain and fear about moving due to the prior day's events, KJB did not get out of bed on February 11, 2024.

124.     Xiao T. Chen, M.D. ("Dr. Chen"), a resident, met with KJB and her parents at approximately 7:00 a.m. on February 12, 2024.

125.     Dr. Chen charted, in relevant part, that KJB "continued to struggle with pain and has not been able to get out of bed over the past day.  She has significant fear

about her back pain from Saturday.  This has since resolved, but there are some lingering psychological effects of that event."

126.    Dr. Chen further charted that "[KJB] and her parents are having some anxiety overall given the acute event on this past Saturday in which she had severe low back pain and BLE numbness/tingly which self-resolved. (sic)  Fortunately, CT scans did not show any grossly concerning findings, though the family is still concerned about instability.  I did provide them with some encouragement and let them know that Dr. Rose had no concerns about the imaging findings."

127.    In accordance with Dr. Rose's direction that KJB resume mobilization, physical therapy visited with KJB at approximately 1:30 p.m. on February 12, 2024 and assisted her to sit up on the side of the bed.

128.    As soon as KJB got to the edge of the bed, everything from her waist down went numb, she had a burning sensation in her lower extremities, and she was unable to move her legs.

129.    Staff assisted KJB back to a supine position.

130.    Dr. Chen charted that "she had a similar instance 2 days ago on Saturday, 2/10, which spontaneously resolved after she laid back flat."

131.    Dr. Chen documented KJB's subjective complaints of burning pain in both lower extremities.  On neurologic exam, Dr. Chen found bilateral lower extremity weakness, diminished sensation in KJB's right lower extremity, and a normal neurological rectal exam.

132.    The history of immediate onset with movement, KJB's complaints of burning pain, and Dr. Chen's exam findings of lower extremity weakness and numbness, are clinically consistent with an acute traumatic incomplete spinal cord injury.

133.    Dr. Rose visited KJB later that afternoon.

134.    Dr. Rose's charting of this event included, in relevant part, that "[t]his is all very unusual.  We had done a single-level facetectomy as part of her operation, which generally does not impart any gross instability in the spine.  She had an episode of this on Saturday [February 10, 2024] that spontaneously resolved."

135.    When Dr. Rose charts that this "generally does not impart any gross instability," he intentionally or negligently disregards that KJB was not a patient with normal spinal alignment and anatomy undergoing a single-level facetectomy.

136.    Rather, KJB had: (a) a baseline thoracolumbar scoliosis which was noted to have worsened on the CT of February 10, 2024; (b) a tumor located at the thoracolumbar junction which involved the posterior elements; (c) invasion of that tumor into her vertebral bodies; (d) multiple levels of laminectomy performed in addition to facetectomy for resection of the tumor; and (e) significant mechanical and neuropathic pain after suffering transient myelopathy following KJB's initial mobilization on February 10, 2024.

137.    These factors placed KJB at a *known or knowable* high risk for spinal instability, and at significant risk of paralysis if her spinal cord was not protected from that instability.

138.    On February 12, 2024, despite the fact that his patient was now suffering from an acute and still evolving incomplete paraplegia, Dr. Rose left KJB to be diagnosed and treated by other providers, charting that "[t]he family knows well that longstanding professional commitments require that I travel and, in fact, I was on the way to the airport when I turned around to come and see her. My colleague, Dr. Karim, has kindly agreed to help out tonight…"

139.    Dr. Karim is a significantly less experienced surgeon than Dr. Rose, as he had just finished his fellowship at Mayo in 2021 and became a board-certified orthopedic surgeon in 2023. Dr. Rose, on the other hand, has been board certified in orthopedic surgery since 2010.

140.    It is believed that the professional commitment Dr. Rose left his paralyzed patient to attend was not a matter of patient care but rather his attendance at the American Academy of Orthopedic Surgeons Annual Meeting. Much of that meeting is a marketing and networking event, and most, if not all, of the educational sessions are subsequently available on demand. (i.e., Dr. Rose's attendance in-person was neither mandatory nor critical).

141.    Later on February 12, after Dr. Rose had left, Dr. Karim ordered an MRI, which revealed critical abnormalities in KJB's thoracolumbar spine, including reported evidence of spinal cord compression and stenosis, as well as abnormal cord signal changes consistent with the significant acute spinal cord injury evidenced on KJB's neurologic examination.

142.     Due to the MRI findings of stenosis and KJB's acute paraplegia, Dr. Karim proceeded with an emergency surgery on February 12 at 11:00 p.m., to explore KJB's thoracolumbar spine and address the spinal cord compression identified on imaging.

143.     During the surgery, Dr. Karim observed a moderate postoperative fluid collection in the epidural space, which he removed.

144.     More notably, he discovered and described findings consistent with acute and profound instability of KJB's spine, including: (a) a "gapped open" right T11-T12 facet joint "with the facet joint capsule itself entirely disrupted," (b) "a gapped open T11-T12 disc space on the left side," and (c) a T11-T12 segment that was "quite mobile in the sagittal plane."

145.     Dr. Karim's direct observations of the gapping and mobility of the T11-T12 segment, combined with the disrupted facet joint capsule, confirm that KJB's thoracolumbar spine was grossly unstable, placing her spinal cord and neurological function at severe risk of traumatic injury with mobilization.

146.     Dr. Karim documented that KJB had somatosensory evoked potentials (SSEPs) in her lower extremities (i.e., sensory nerve function) on intraoperative neuromonitoring conducted during surgery on February 12, 2024, meaning she was not completely paraplegic at the time of this surgery.

147.     Despite recognizing her unstable spinal condition during surgery, Dr. Karim failed to surgically stabilize KJB's spine through placement of instrumentation or other surgical immobilization, a critical step that the standard of care required to prevent further neurological deterioration after surgery.

148. Dr. Karim's decision to forego immediate stabilization of KJB's thoracolumbar spine on February 12, 2024, violated the standard of care, as he was fully aware of her significant spinal instability and the acute neurological risks associated with leaving that condition untreated.

149. Dr. Karim's failure to stabilize KJB's spine on February 12, 2024, allowed her untreated gross instability to continue to injure her spinal cord, ultimately resulting in KJB's progression to complete paraplegia shortly after the surgery of February 12, 2024.

150. Timely stabilization by Dr. Karim would have, at a minimum, increased KJB's odds of not becoming completely paraplegic and/or experiencing meaningful neurologic recovery.

151. On February 13, 2024, Dr. Karim documented that his exam "was different from yesterday afternoon…" and that KJB's exam was now demonstrating absence of lower extremity motor function and significant loss of sensory function below T12. Dr. Chen also examined KJB on February 13, 2024 and documented worsening abnormalities indicative of a now complete spinal cord injury.

152. At some point on February 14, 2024, Plaintiff's access to KJB's medical chart was suspended.

153. On February 15, 2024, Dr. Stans performed the scheduled/elective surgery to correct KJB's scoliosis, which now included decompression of the spinal cord and stabilization of KJB's unstable T11-T12 region.

154.    During this procedure, Dr. Stans described findings consistent with significant instability in KJB's thoracolumbar spine, consistent with the findings Dr. Karim noted on February 12, 2024, but failed to address surgically at that time.

155.    Specifically, Dr. Stans was able to directly visualize the T11-T12 disc space on the left side due to the extensive resection performed in prior surgeries, and he noted that the superior cartilaginous endplate at T12 had separated from the osseous vertebral body, indicating structural compromise at this level.  This open disc space and separation provided further evidence of gross instability, highlighting the acute need for stabilization measures to prevent additional spinal cord damage.

156.    In response to the instability, Dr. Stans implemented extensive stabilization measures, including the placement of bilateral pedicle screws at T10, T11, T12, and L1 to secure the thoracolumbar segment and prevent further vertebral displacement or misalignment.

157.    During the stabilization portion of the surgery performed from T10 to L1, Dr. Stans charted that he performed a "mild deformity correction" which he described as resulting in decompression of the spinal cord – "diminished contact between the bone of the vertebrae and the dura and spinal cord from T10 to L1."

158.    Dr. Stans used rods and pedicle screws to attain stability and structural support across the T11-T12 region that had been compromised by tumor involvement and the two prior procedures to resect the tumor, employing the stabilization measures that could have, and should have, been performed prior to or on 2/12/24 on February 12, 2024, when Dr. Karim encountered clear signs of instability at the T11-T12 level.

159.     During this February 15, 2024 procedure, Dr. Stans found that KJB had absence of both motor evoked potentials (MEPs) and SSEPs on intraoperative neuromonitoring, indicating a total loss of sensory and motor function due to irreversible spinal cord injury sustained in the days following Dr. Karim's failure to stabilize her spine.

160.     The absence of SSEPs and MEPs on February 15, 2024, confirmed that KJB's spinal cord had suffered further severe, irreversible damage resulting in the complete loss of sensory and motor function that could have been avoided had appropriate stabilization been performed during Dr. Karim's surgery on February 12, 2024.

161.     Put simply, KJB was now completely paraplegic.

162.     KJB has no ability to move or feel her lower body and has lost the ability to control her bowel and bladder function.

163.     The delay in stabilization from February 12, 2024 to February 15, 2024 allowed for progressive spinal cord injury, transforming KJB's severe but, as of yet, incomplete spinal cord injury and partial neurological deficits on February 12, 2024 into a permanent paraplegia with a complete loss of all motor and sensory function, which timely stabilization would have prevented.

164.     Dr. Karim's failure to stabilize KJB's spine on February 12, 2024, despite recognizing the hypermobility and gross disruption of the T11-T12 segment, constitutes a deviation from the standard of care that led directly to KJB's catastrophic neurological worsening.

165.    The violations of the standard of care by Dr. Rose and Dr. Karim caused KJB to suffer complete paraplegia, which is permanent and without expectation of meaningful recovery in the future.

166.    Rather than acknowledge spinal instability as the obvious cause of KJB's acute traumatic spinal cord injury, Dr. Rose and others at the Mayo Clinic adopted an absurd diagnosis of fibrocartilaginous embolism (FCE) as the cause of KJB's paraplegia.

167.    The theory of FCE involves the embolization of spinal disc material, resulting in the blockage of blood flow to the spinal cord.  It is a diagnosis rarely, and only questionably, made in humans and more commonly discussed as a rare event described in veterinarian literature pertaining to dogs.

168.    The diagnosis of FCE requires first that acute spinal instability and resultant spinal cord injury, the most obvious and likely diagnosis in KJB's case, be ruled out.  That was not done in this case.

**G.    The profound financial and human impact of KJB's paralysis.**

169.    As a result of Defendants' medical malpractice, KJB, a 13-year-old girl at the time of the surgeries, suffered catastrophic and permanent paralysis from the waist down. This life-altering injury has resulted in profound non-economic and economic damages, fundamentally impacting every aspect of KJB and her family's lives.

170.    The paralysis has deprived KJB of the ability to engage in numerous activities, stripping her of independence, mobility, and dignity.

171.    KJB will be unable to do basic tasks like stand, walk, run, or climb stairs. She will be unable to participate in common recreational activities like swimming,

skating, or skiing.  She will no longer be able to play competitive softball, which she loved.  KJB can no longer perform basic activities of daily living without assistance, such as bathing or getting in and out of a vehicle.  She will not experience life milestones traditionally associated with independence and mobility, such as standing next to her prom date, walking down the aisle, or having a traditional first dance.

172.    KJB's injury has also materially altered her privacy and dignity.  Her impairments include, but are not limited to, requiring assistance for basic functions such as using the bathroom and changing clothes and must now rely on medical devices such as catheters, with a heightened risk of embarrassment, psychological anguish, and medical complications related to their use.

173.    KJB faces lifelong financial burdens due to her paralysis, including but not limited to:

    a.    Costs of hospitalization, surgeries, medications, and rehabilitation incurred to date; and

    b.    Ongoing and lifelong medical expenses, including physical therapy, specialized equipment, home modifications, attendant care services, and treatment of the many significant complications expected due to her permanent complete paraplegia.

174.    KJB's ability to enter the workforce and earn an income has been significantly impaired.

175.    Due to her paralysis, KJB faces an elevated risk of pressure ulcers, urinary tract infections, deep vein thrombosis, pulmonary embolism, bladder cancer, painful

spasticity, and chronic pain, necessitating continuous medical monitoring and treatment and possible further surgeries.

176.    The limitations, impairments, and future concerns set forth above are a partial list and are not exhaustive.

177.    KJB will require accommodations such as:

    a.    Permanent use of handicap-accessible facilities and modified living spaces.

    b.    Dependence on specialized transportation and equipment.

    c.    Constant assistance with daily tasks, including cooking, cleaning, and childcare.

178.    The toll of these damages extends to KJB's family, who bear the financial and emotional burden of caregiving, adapting their home, and sacrificing income to provide for her needs.

179.    These profound and irreversible injuries underscore the devastating impact of Defendants' negligence on KJB's life and the lives of those who care for her.

180.    KJB and her parents have incurred hundreds of thousands of dollars in medical bills and will incur millions of dollars in health care related bills in the future as a result of Defendants' negligence.

<u>**Count One**</u>
**Medical Malpractice**
*Plaintiff v. Defendants*

181.    Plaintiff realleges each preceding paragraph as if fully stated herein.

182.    Defendants, and other medical providers at Mayo, had a duty to act within the standard of care of medical professionals in providing care to KJB.

183.    Defendants breached the medical standard of care with respect to their actions and inactions towards KJB as described herein and as to further be proven in discovery.

184.    These breaches include but are not limited to: (a) Dr. Rose failing to create and implement a plan to provide for the stability of KJB's spine and protection of her spinal cord during the first two stages of her surgical procedures; (b) Dr. Rose and Dr. Karim failing to recognize and address symptoms, signs, imaging and intraoperative findings, indicating spinal instability and great risk of injury to KJB's spinal cord, during their care and treatment of KJB; (c) Dr. Karim failing to stabilize KJB's spine during the February 12, 2024, surgery, despite observing significant instability and hypermobility, including gapping of the T11-T12 facet joint and disc space, constituting a clear violation of the standard of care.

185.    Dr. Rose and Dr. Karim's collective failure to implement stabilization measures directly and proximately caused KJB to endure severe and irreversible spinal cord injury and complete paraplegia.

186.    In the alternative, Dr. Karim's failures resulted in a loss of chance that KJB could have recovered from the harm Dr. Rose caused if Dr. Karim would have acted within the standard of care.

187.    These wrongful acts and omissions directly and proximately caused and will cause KJB to sustain severe and permanent physical and emotional injuries, together with past and future medical expenses, past and future bodily and mental harm, future and other items of special and compensatory damages.

188. These wrongful acts and omissions directly and proximately caused and will cause Plaintiff and her husband to incur past and future medical supplies, hospital services, health care services, and other expenses in order to care for KJB.

189. Defendants are liable to Plaintiff individually and on behalf of KJB in an amount far exceeding $75,000.

190. By the conduct described herein, Drs. Rose and Karim deliberately proceeded to act in conscious or intentional disregard of the high degree of probability of injury to KJB's rights and safety.

191. By the conduct described herein, Drs. Rose and Karim deliberately proceeded to act with indifference to the high probability of injury to KJB's rights or safety.

192. Drs. Rose and Karim are liable to KJB for punitive damages in an amount to be determined by a jury.

193. Defendant Mayo Clinic is vicariously liable for all non-punitive damages alleged in this count.

**Count Two**
**Negligent Nondisclosure**
*Plaintiff v. Defendants*

194. Plaintiff realleges each preceding allegation as if fully stated herein.

195. Defendants knew or should have known about the risks associated with not surgically stabilizing KJB's spine during each of the surgical procedures described herein.

196. Defendants Dr. Rose and Dr. Karim had a duty to disclose to KJB and her family the risks associated with proceeding without stabilizing her thoracolumbar spine during her surgeries, particularly given KJB's scoliosis and the extensive nature of her spinal procedures.

197. Defendants failed to disclose material risks regarding the potential for spinal instability and paralysis if stabilization measures were not implemented, thereby depriving KJB and her family of the information necessary to make an informed decision regarding her treatment plan.

198. Had KJB and her family been informed of the risks and the reasonable alternatives, including intraoperative stabilization measures, they would have likely declined to proceed with the planned surgeries in the manner undertaken by Dr. Rose and Dr. Karim.

199. Defendants' failure to disclose the significant risk of spinal instability during and after the tumor resection surgery deprived KJB of her chance to pursue alternative, safer treatment options, and ultimately resulted in the progression of her condition to complete paraplegia.

200. Dr. Rose and Dr. Karim's collective failure to implement stabilization measures directly and proximately caused KJB to endure severe and irreversible spinal cord injury and complete paraplegia.

201. In the alternative, Dr. Karim's failures resulted in a loss of chance that KJB could have recovered from the harm Dr. Rose caused if Dr. Karim would have acted within the standard of care.

202.    These wrongful acts and omissions directly and proximately caused and will cause KJB to sustain severe and permanent physical and emotional injuries, together with past and future medical expenses, past and future bodily and mental harm, future and other items of special and compensatory damages.

203.    These wrongful acts and omissions directly and proximately caused and will cause Plaintiff and her husband to incur past and future medical supplies, hospital services, health care services, and other expenses in order to care for KJB.

204.    Defendants are liable to Plaintiff individually and on behalf of KJB in an amount far exceeding $75,000.

205.    By the conduct described herein, Drs. Rose and Karim deliberately proceeded to act in conscious or intentional disregard of the high degree of probability of injury to KJB's rights and safety.

206.    By the conduct described herein, Drs. Rose and Karim deliberately proceeded to act with indifference to the high probability of injury to KJB's rights or safety.

207.    Drs. Rose and Karim are liable to KJB for punitive damages in an amount to be determined by a jury.

208.    Defendant Mayo Clinic is vicariously liable for all non-punitive damages alleged in this count.

**A jury trial is hereby demanded.**

**A declaration of expert review is served herewith.**

WHEREFORE, Plaintiff prays for judgment as follows:

1.     As to Count One, a money judgment against Defendants in favor of Plaintiff, individually and on behalf of KJB, in an amount to exceed $75,000, together with interest, costs, and disbursements;

2.     As to Count Two, a money judgment against Defendants in favor of Plaintiff, individually and on behalf of KJB, in an amount to exceed $75,000, together with interest, costs, and disbursements; and

3.     For such other and further relief as this Court deems just and equitable.

**Storms Dworak LLC**

Dated:  January 21, 2025

/s/ Jeffrey S. Storms
Jeffrey S. Storms, #387240
Paul C. Dworak, #391070
222 South 9th Street, Suite 470
Minneapolis, MN 55402
Telephone: 612.333.7050
jeff@stormsdworak.com
paul@stormsdworak.com

- and -

**Honkanen Law Firm, S.C.**
Erik J. Honkanen
U.S. Bank Plaza
230 1st St. South, Ste. 101
Virginia, MN 55792
Telephone: 218-749-3047
erik@honkanenlaw.com

- and -

**James G. Lowe, MD Law, LLC**
James G. Lowe, MD, JD
(PA# 329924) (admitted pro hac vice)
One Liberty Place
1650 Market Street
Suite 3600
Philadelphia, PA 19103
Jim@lowemdlaw.com