**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Ashley Barton, individually,
and o/b/o K.J.B., a minor,

Plaintiff,

v.

Mayo Clinic, Peter S. Rose, M.D., and
Mohammed Karim, M.D.,

Defendants.

Case No. 25-cv-33 (LMP/DLM)

---

**Plaintiff's Memorandum of Law in Support of**
**Her Motion Challenging Confidentiality Designations**

---

In February 2024, Plaintiff Ashley Barton's teenage daughter, K.J.B., received medical care at Mayo Clinic ("Mayo"), during and after which her physicians exchanged numerous text messages concerning [redacted] Defendants produced those messages in discovery but designated every one of them "confidential" under the Protective Order. This Motion presents a simple question: what makes these messages confidential? Under Rule 26(c), Defendants must establish good cause for protecting them, not merely that the physicians expected their communications to remain private.

The messages are [redacted]. They contain no proprietary information, privileged legal advice, or communications generated through a protected peer-review process. To the

extent they [redacted], any privacy interest belongs to K.J.B., who seeks their de-designation. Notably, Mayo's own [redacted]

Defendants claim that disclosure could chill physician candor or generate prejudicial publicity. But those concerns, even if given credence, cannot transform ordinary, nonprivileged communications into confidential information under Rule 26(c). The Protective Order protects genuinely confidential information – not evidence whose disclosure may prove uncomfortable or damaging. The Court should order the challenged text messages de-designated.

## <u>Background</u>

### I. K.J.B.'s Condition and Planned Surgeries[1]

This medical-malpractice action arises from a series of three planned surgeries performed on K.J.B., a neurologically intact thirteen-year-old, at Mayo in February 2024. K.J.B. had scoliosis caused by a benign tumor growing in and around her spine, primarily at the T11-T12 vertebral level. The surgical plan had three stages: Stage One to expose and mobilize the portion of the tumor inside the spinal canal; Stage Two to remove the

[1] The medical information set forth in this Memorandum's Background section is documented in K.J.B.'s voluminous medical records. Given the already substantial record accompanying this Motion, Plaintiff has not separately cited or submitted those records, nor does Plaintiff intend to create controversy over medical topics, but will gladly provide any additional medical support the Court requests or deems necessary. The other documents cited herein, including all challenged text messages, are attached to the Declaration of Plaintiff's counsel, Jeffrey S. Storms, submitted with this Motion.

remaining tumor from the side of the spine and chest; and Stage Three to correct K.J.B.'s scoliosis. The first two surgeries required removal of the tumor and portions of the spine in and around T11-T12, making stability of that area a particularly important clinical concern.

Over the ten days between the first surgery and the final stabilization procedure, K.J.B. went from neurologically intact to completely paraplegic. The central medical dispute concerns why. Plaintiff contends the surgeries rendered the T11-T12 motion segment mechanically unstable; that movement of the unstable spine injured K.J.B.'s spinal cord; and the failure to timely recognize and stabilize that instability allowed her neurologic injury to progress to complete paraplegia. To the best of Plaintiff's present understanding, Defendants attribute K.J.B.'s paralysis to a spinal-cord infarction rather than traumatic injury caused by mechanical instability. That competing explanation – mechanical instability and traumatic spinal-cord injury versus spinal-cord infarction – provides crucial context for [redacted] this Motion.

## II. Key Players and Events

In order to provide context for the messages at issue, Plaintiff provides here a list of involved Mayo physicians and a timeline of relevant events.

### A. The involved Mayo physicians

The identities and roles of the Mayo physicians involved in K.J.B.'s care are:

**Dr. Peter Rose** — Attending orthopedic surgeon primarily responsible for removing K.J.B.'s tumor. Dr. Rose performed the first two stages of the

planned three-stage surgery on February 5 and 7, including the removal of structures in and around the T11-T12 level of K.J.B.'s spine.

**Dr. Marisa Ulrich** — Orthopedic intern (first year resident) who was among the first physicians to evaluate K.J.B. after a February 10 event in which K.J.B. felt a "pop" while moving, experienced severe pain and neurologic symptoms, and lost control of her bladder.

**Dr. Paul Gagnet** — Orthopedic fellow involved in K.J.B.'s care following the February 10 event. He ordered a February 10 CT and afterwards ordered strict bedrest and spinal precautions; the following morning, after conferring with Dr. Rose, those precautions were discontinued.

**Dr. Tony Chen** — Orthopedic resident involved in K.J.B.'s care during the surgical hospitalization and present for K.J.B.'s first three surgeries. On February 12, he evaluated K.J.B. after she again developed severe neurologic symptoms with movement and documented lower-extremity weakness and diminished sensation.

**Dr. Mohammed Karim** — Attending spine surgeon who became directly involved after K.J.B. suffered significant neurologic deterioration on February 12. During emergency surgery that night, Dr. Karim found the T11-T12 area "quite mobile," with a gapped-open disc space and disrupted facet joint, but did not stabilize K.J.B.'s spine at that time.

**Dr. Anthony Stans** — Pediatric orthopedic surgeon responsible for the planned third stage of K.J.B.'s surgery to correct her scoliosis. Dr. Stans ultimately performed the February 15 scoliosis surgery, which included stabilization of K.J.B.'s spine across the T11-T12 segment.

## B. Timeline of critical events

The events giving rise to this case occurred over a short period of time:

**February 5 – Stage-one surgery**. Dr. Rose performed the first tumor-exposure surgery, including removing the entire left T11-T12 facet joint and portions of the surrounding vertebrae. K.J.B.'s spine was not surgically stabilized, and she remained neurologically normal immediately after the surgery.

**February 7 – Stage-two surgery**. Dr. Rose performed the second tumor-removal surgery, including removing the tumor involving the T11 and T12

spinal segments. K.J.B.'s spine again was not surgically stabilized but she again remained neurologically normal immediately after the surgery.

**February 10 – First neurologic event**. While being moved back to bed, K.J.B. felt a "pop," collapsed, experienced severe back pain, lost feeling in her legs, and lost control of her bladder. Her neurologic symptoms later improved. A CT that evening showed new changes at T11-T12, including widening of the space between the vertebrae and a possible fracture. The radiologist specifically reported that an unstable spine should be considered. K.J.B. was then placed on strict bedrest and spinal precautions.

**February 11 – Spinal precautions removed**. Dr. Rose reviewed the CT and documented that he was not concerned with its findings. At his direction, K.J.B.'s spinal precautions were discontinued and she was again encouraged to move without restrictions.

**February 12 – Second neurologic event and emergency surgery**. When physical therapy helped K.J.B. sit at the edge of her bed, she again experienced immediate neurologic symptoms – this time including numbness from the waist down and an inability to move her legs. Dr. Karim performed emergency surgery that night. He found the T11-T12 area [redacted] with an open disc space and a disrupted facet joint. Despite the findings reported by Dr. Karim, he elected not to surgically stabilize KJB's spine.

**February 13 – Neurologic deterioration**. Following surgery, it became clear that K.J.B.'s neurologic condition had worsened. She had complete loss of lower-extremity motor function and significant loss of sensation below T12.

**February 15 – Stabilization surgery**. Dr. Stans performed the previously scheduled third surgery, which included stabilization of the T11-T12 area with screws and rods extending from T10 through L1. By that time, intraoperative monitoring showed no measurable motor or sensory signals in K.J.B.'s lower extremities, confirming that K.J.B. had already suffered complete loss of motor and sensory function below T11-T12.

### III. Procedural History of Text Message Production and Confidentiality Designations.

Plaintiff issued a discovery request that demanded, among other things, all text messages "referring or relating to KJB, her care, or her medical condition, from January 29, 2024, to February 29, 2024."[2] Defendants responded, in part, that "Mayo will produce any non-privileged, non-protected, responsive emails or text messages involving Dr. Rose, Dr. Karim, and Dr. Stans regarding KJB's medical care identified following reasonable and diligent search."[3]

Defendants made their first production of text messages on July 18, 2025.[4] They marked all of those messages—and all text messages since—as "confidential" under the Protective Order. Plaintiff proceeded to take the depositions of Dr. Stans (9/3/25), Dr. Amy Kolbe (9/4/25), Dr. Ulrich (9/10/25), Dr. Rose (9/12/25), Arikka Davison, R.N. (9/23/25), Dr. Marc Patterson (9/29/25), Dr. Chen (10/6/25), and Dr. Karim (10/8/25).

Defendants produced a small, second set of text messages on October 29, 2025, shortly before the October 31 deposition of Dr. Gagnet.[5] Following Dr. Gagnet's deposition, Plaintiff began raising concerns about the designation of text messages as confidential and indicated an intent to challenge at least a portion of the produced text messages.[6] After some back and forth, on December 12, 2025, Mayo informed Plaintiff's counsel that it would not de-designate the text messages, that it was producing **even**

---

[2] Storms Decl. Ex. A, Def. Res. Pl's RFPs at No. 2.
[3] *Id.*, Response.
[4] Storms Decl. Ex. B, Bates Nos. Mayo_Barton009287 – 9309.
[5] Storms Decl. Ex. C, Bates Nos. Mayo_Barton009463 – 9468.
[6] Storms Decl. Ex. D at 6 of 9.

**more** text messages, and that Mayo was offering Plaintiff the opportunity to re-depose Dr. Chen based on the new text-message release.[7]

A third set of text messages was produced on December 12, 2025.[8] After conferring, the parties agreed to a temporary stay of deadlines to address, among other things, the re-taking of depositions in light of the new text messages and a forensic protocol for the review and production of text messages. That stay was then extended several times.[9] The parties continued meet-and-confer efforts in writing and orally, ultimately agreeing to terms for re-deposition of witnesses, but not reaching agreement on the de-designation of text messages marked confidential.[10]

The parties eventually agreed upon a forensic protocol and began collecting the cell phones of the various providers. However, Dr. Karim's phone was initially claimed not to be available due to suspicious circumstances.[11] Ultimately, his phone was determined to be available, but still has not been collected and forensically examined.

Mayo produced a fourth set of text messages on April 3, 2026,[12] and a fifth set on August 17, 2026.[13] Plaintiff conducted the re-deposition of Dr. Stans on September 16, 2026, during which it became clear Dr. Stans possessed even *more* text messages that had

---

[7] *Id.* at 1 of 9.
[8] Storms Decl. Ex. E, Bates Nos. Mayo_Barton009610 – 9631 and 009638 – 9639.
[9] *See* ECF Nos. 38, 41, and 44.
[10] Some of the parties' written efforts are contained at Storms Declaration Exhibit F (various letters).
[11] ECF Nos. 57, 58.
[12] Storms Decl. Ex. G, Bates Nos. Mayo_Barton030986 – 31049.
[13] Storms Decl. Ex. H, Bates Nos. Mayo_Barton031058 – 31242.

not been produced, which were then provided mid-deposition.[14] Somehow, Dr. Stans never searched his own phone for responsive text messages: "Q. Have you ever made an effort to look for text messages on your phone? A. I have not."[15]

**IV. The Mayo Physicians' Text Messages**

The text messages produced in this case [redacted]. [redacted] Most concerning, Mayo did not produce many of the messages until after key physicians had been deposed, [redacted]

The text messages are therefore unusually important evidence. They provide [redacted] Yet Mayo has designated the text messages wholesale as "confidential" under the Protective Order, preventing Plaintiff from publicly disclosing even those

[14] Storms Decl. Ex. I, Bates Nos. Mayo_Barton031243 – 31244.
[15] Storms Decl. Ex. J (Stans Dep.) 8:19-21; *see also id.* at 8:22 – 9:5.

communications [redacted]

The messages are best understood in the context of the events as they unfolded. The examples below are not an exhaustive account of the text-message discovery. Rather, they highlight several of the most significant communications, presented chronologically, to show [redacted]. Where relevant, the messages are compared with the contemporaneous medical record and the physicians' later sworn testimony, [redacted]

### A. February 10: K.J.B.'s First Neurologic Event and Concerns About Spinal Instability

[redacted]

[redacted]

[redacted]

[redacted][16]

Dr. Rose did not order imaging or visit K.J.B. to clinically assess her condition before informing Dr. Gagnet that he was not concerned about the stability of K.J.B.'s spine. But K.J.B.'s mother works as a nurse in the practice of neurosurgery, and due to

[16] Storms Decl. Ex. H at 031234.

her persistence, a CT scan was ultimately ordered. That February 10 CT scan included the following critical impression: "New disc space widening about the left lateral aspect of T11-T12. Noted intervening linear osseous hyperdensity. Finding may represent displaced fracture of the T12 superior endplate versus postsurgical changes. Associated focal levocurvature at this level, increased since prior. **An unstable spine** in the context of left facetectomies should be considered."[17]

Dr. Gagnet was so concerned about these findings that he placed K.J.B. on spinal precautions and NPO in preparation for her to have stabilization surgery in the morning.[18] He then sent [redacted]

[17] Storms Decl. Ex. K (bolding added).
[18] Storms Decl. Ex. L (Gagnet Dep.) at 34:17-21 ("Q. [W]hen you put K.J.B. on strict bedrest and NPO, was your working diagnosis that she had an unstable spine? A. Yes, that was -- that was my concern.").

[redacted]

[redacted]

### B. Feb. 11: Dr. Rose Removes Spinal Precautions and Directs K.J.B. to Resume Mobilization

Despite these concerns, Dr. Rose did not proceed with stabilization surgery or obtain any additional radiological studies. Instead, he removed K.J.B. from spinal precautions and directed that she resume mobilization without restrictions. K.J.B. did not get out of bed on February 11, 2024. Subsequent text messages [redacted]

> [redacted]

> [redacted]

Despite these serious events and decisions, neither Dr. Gagnet nor anyone else documented in any progress note a differential diagnosis related to the events of 2/10/24, Dr. Gagnet's preparations for surgery, his interactions with Dr. Rose, nor offered any explanation for the decision not to proceed with stabilization without further workup, such as an MRI.

---

[19] Storms Decl. Ex. G, Mayo_Barton030990.

### C. February 12: K.J.B.'s Paralysis and the Emergency Surgery Reveals Significant Spinal Instability

On February 12, K.J.B. was again mobilized. Physical therapy helped her sit at the edge of the bed when she experienced an immediate and severe neurologic decline: everything below her waist became numb, she experienced burning pain in her legs, and she could no longer move them. The event prompted further evaluation and ultimately emergency surgery that evening.

Dr. Rose saw K.J.B. on the 12th but did not stay to review her imaging or perform the necessary emergency surgery. Instead, he flew to the American Association of Orthopedic Surgeons conference in San Francisco. Dr. Chen [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

20 [redacted]

21 Storms Decl. Ex. G, Mayo_Barton031030-031031.

> [redacted]
>
> [redacted][2]

Following the emergency surgery, [redacted]"[23] Approximately 30 minutes earlier, [redacted]

> [redacted].[24]

---

[22] *Id.*, Mayo_Barton030996-030999.
[23] Storms Decl. Ex. B, Mayo_Barton009303 (bolding added).
[24] Storms Decl. Ex. G, Mayo_Barton031035 (bolding and underlining added).

Later, at 1:00 a.m. on February 13, 2024, [redacted]”[25]

What is deeply troubling about [redacted]

> [redacted]
>
> [redacted]
>
> [redacted]
>
> [redacted][26]
>
> * * *
>
> [redacted]
>
> [redacted]
>
> [redacted]

---

[25] Storms Decl. Ex. E, Mayo_Barton009625 (bolding added).
[26] Storms Decl. Ex. M (Chen Dep.), 229:7-24.

> [redacted]
>
> * * *
>
> [redacted][28]

*Id.* at 230:4-13. The [redacted].

In light of the spinal instability identified during the emergency surgery, Plaintiff has alleged a medical malpractice claim against Dr. Karim for a failure to stabilize at that time. [redacted]:

> [redacted]

---

[27] *Id.* at 241:19 – 242:6.
[28] *Id.* at 230:4-13.

[redacted][29]

### D. February 13: Mayo Physicians Question the [redacted]

On February 13, an ischemic or infarct mechanism had emerged as a potential explanation for K.J.B.'s neurologic injury. The contemporaneous [redacted]

[redacted][30]

[redacted]:

[redacted]

---

[29] Storms Decl. Ex. H, Mayo Barton 031134. The reference to "slides" appears to concern a potential presentation of K.J.B.'s case at Mayo's Morbidity and Mortality ("M&M") conference, which the physicians discuss elsewhere in their communications.
[30] Storms Decl. Ex. E, Mayo_Barton009638.

[redacted].[31]

[redacted]:

[redacted]

[redacted][2]

**E. February 14: Mayo Physicians Conclude [redacted]**

After beginning to treat K.J.B. as if she had suffered an infarct, by February 14, the plan had changed. [redacted]:

[redacted]

[redacted][33]

[redacted]

[redacted]

[31] Storms Decl. Ex. H, Mayo_Barton031197. [redacted]

[32] Storms Decl. Ex. G, Mayo_Barton030988.

[33] Storms Decl. Ex. H, Mayo_Barton031133 (bolding added).

[redacted][34]

[redacted]

[redacted][35]

**F. After the Lawsuit:** [redacted]

On January 23, 2025, [redacted]:

[redacted]

[34] Storms Decl. Ex. H, Mayo_Barton031183 – 031184.
[35] *Id.*, Mayo_Barton031186.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[36] *Id.*, Mayo_Barton031073.
[37] *Id.*, Mayo_Barton031189-031190.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[38] *Id.*, Mayo_Barton031214 (bolding added).

[redacted]

[redacted][39]

## Argument

While Plaintiff may not yet have the complete body of responsive text messages and discovery remains ongoing, the parties' positions on confidentiality are sufficiently developed for resolution by the Court. Defendants maintain that all physician text messages produced in this litigation should remain confidential under the Protective Order,[40] generally offering three grounds: (1) Mayo routinely designates physician communications occurring outside the medical record as confidential; (2) public disclosure of such communications would inhibit candid communication and the learning environment at Mayo; and (3) Plaintiff seeks de-designation to provide the messages to the press. To the best of Plaintiff's understanding, Defendants do not contend that the text messages themselves constitute privileged peer-review communications or are otherwise subject to statutory peer-review protection.

Plaintiff's position is that none of Mayo's text messages should be designated as confidential. The messages [redacted]

[39] *Id.*, Mayo_Barton031228.

[40] Defendants also claim that deposition testimony, expert reports, and other materials that quote or reference those messages must be confidential. But they have not identified with specificity the portions of those derivative materials they contend require confidential treatment, leaving Plaintiff uncertain as to what must presently be filed confidentially.

[redacted]. Plaintiff thus believes she should have the right to disseminate the messages however she sees fit. Plaintiff also asserts that Mayo's categorical practice of designating communications outside the medical record as confidential does not establish that these particular communications are entitled to protection, and Mayo cannot render [redacted]

## I. General Principles for Confidentiality

The Federal Rules of Civil Procedure recognize that, in some instances, court-imposed controls over documents produced in discovery are necessary. The disclosure of "a trade secret or other confidential research," for example, could put a corporation at a competitive disadvantage or worse, and thus the Rules allow such information to be protected from dissemination. Fed. R. Civ. P. 26(c)(1)(G). This is accomplished by a protective order, through which the Rules grant a court authority to "specify[] terms" for discovery and "limit[] the scope of disclosure" when the movant demonstrates "good cause" therefor. Fed. R. Civ. P. 26(c)(1).

Of course, these same rules can be abused. The Federal Judicial Center has noted that parties "often *over-designate* confidential information—erring on the side of protection even if the documents do not rise to the level of confidential." Trade Secret Case Management Judicial Guide, § 6.5.2 at 6-6 (Fed. Jud. Ctr. 2023) (emphasis

added);[41] *see also* Hon. Leigh Martin May, Standing Order Regarding Civil Litigation, at 19-20, (N.D. Ga. Sept. 15, 2021) ("While the Court recognizes the legitimacy of" protective orders, "the Court's experience is that such orders are used—and abused—more often than truly necessary.").[42] And this Court is no stranger to the phenomenon. Time and again our Judges have had to remind parties that Protective Orders do not provide *carte blanche* to shield from public disclosure anything they would prefer to remain private. *See, e.g.*, *Toyota Motor Sales, U.S.A., Inc. v. Allen Interchange LLC*, No. 22-cv-1681, 2025 WL 2254019, at *2 (D. Minn. Aug. 7, 2025) (denying motion to de-designate while "strongly encourag[ing]" the parties to "resist the temptation to over-designate documents"); *Taiyo Int'l, Inc. v. Phyto Tech Corp.*, 275 F.R.D. 497, 502 n.2 (D. Minn. 2011) (warning the parties to "be careful, indeed scrupulous" not to "abuse" protective order and "over-designat[e]" documents). As Judge Leung stated in *CellTrust Corp. v. ionLake, LLC*, "there is an implicit duty of good faith in Rule 26(c) and the designation of documents under a protective order." No. 19-cv-2855, 2022 WL 1553558, at *3 (D. Minn. May 17, 2022) (collecting cases).

The text messages at issue here essentially fall into two tranches. [redacted]

[41] The Case Management Judicial Guide is available at https://www.fjc.gov/sites/default/files/materials/08/Trade%20Secret%20final.pdf

[42] The Standing Order is available at https://www.gand.uscourts.gov/sites/gand/files/LMM_CVStandingOrder.pdf

[redacted] Regardless of which category the messages fall into, there is simply no basis for them to be "confidential" under the Protective Order.

## II. De-Designation Standards

The Protective Order allowed Defendants to designate documents as confidential, while at the same time permitting Plaintiff to challenge any such designation. Once Plaintiff does so, as here, the burden is on Defendants to "show that the designation satisfies" Rule 26(c). Dkt. No. 21, ¶ 7(c). As noted above, this is consistent with the strictures of Rule 26. *See* Fed. R. Civ. P. 26(c)(1) (authorizing a court to issue an order imposing terms on discovery, but only upon a showing of good cause by the party seeking such imposition). To do so, Defendants must make "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements," to support confidentiality. *Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1212 (8th

Cir. 1973); *accord, e.g.*, *Edeh v. Equifax Info. Servs., LLC*, No. 11-cv-2671, 2013 WL 2480676, at *2 (D. Minn. June 10, 2013).

Analyzing Defendants' designations in this way is crucial. True, the Protective Order allows "confidential" documents to be shielded from dissemination. But it does not define the term "confidential," and thus it must be understood in the context of Rule 26(c), from which the authority to shelter documents emanates in the first place. Under that Rule, information is not "confidential" merely because it is nonpublic, internal, or was communicated privately. *See, e.g.*, *Duffy v. Lawrence Mem'l Hosp.*, Case No. 2:14-cv-2256, 2017 WL 131593, at *4 (D. Kan. Jan. 13, 2017) (rejecting confidentiality designation over email plaintiff "expected and intended to remain confidential"); *In re Aqua Dots Prods. Liab. Litig.*, No. 1-08-cv-2364, 2009 WL 1766776, at *2 (N.D. Ill. June 23, 2009) ("Internal business information is not confidential merely because it is traditionally . . . private."); *Flynn v. Oakland Cnty.*, No. 05-73850, 2006 WL 950282, at *3 (E.D. Mich. Apr. 12, 2006) (documents not confidential simply because they are not normally revealed to others); *Cook, Inc. v. Boston Sci. Corp.*, 206 F.R.D. 244, 248 (N.D. Ind. 2001) (noting that "'[n]on-public' is too vague," and if "it means only that the information is not available to the general public, then it is insufficient"). Rather, confidentiality requires some legitimate interest in maintaining the secrecy of the information itself, such as a recognized privacy interest, proprietary or competitive value, privilege, or a legal or contractual obligation of confidentiality – something constituting the "good cause" Rule 26 demands. *Gen. Dynamics*, 481 F.2d at 1212; *Hobbs v. Employers Mut. Cas. Co.*, No. 5:17-cv-5040, 2018 WL 325867, at *2 (D.S.D. Jan. 8,

2018); *Minter v. Wells Fargo Bank, N.A.*, Civ. Nos. WMN-07-3442, WMN-08-1642, 2010 WL 5418910, at *8 (D. Md. Dec. 23, 2010). Indeed, some courts decline to endorse stipulated protective orders when they fail to delineate what type of information is "legitimately confidential." *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 946 (7th Cir. 1999); *accord, e.g.*, *Taylor ex rel. Burnes v. Hercules Tire & Rubber Co.*, No. 3:06-cv-1028, 2007 WL 4372076, at *1-2 (S.D. Ill. Dec. 12, 2007).[43]

## III. The Challenged Text Messages Deserve No Protection

Applying these principles to the challenged text messages demonstrates why Defendants cannot carry their burden to show continued confidentiality is appropriate. As noted, [redacted] Neither category contains information in which Defendants can identify a legitimate interest sufficient to warrant continued restriction under Rule 26(c).

### A. The messages do not contain information confidential to the Mayo doctors.

The first category [redacted]

[43] That said, the fact that Plaintiff stipulated to the Protective Order allowing Defendants to designate materials as confidential does not undermine her arguments. *See, e.g.*, *Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*, Case No. 3:20-cv-1681, 2021 WL 186932, at *2 (D. Or. Jan. 19, 2021) ("that the parties may have stipulated to a protective order is not itself a basis for … restricting access to any specific discovery material").

[redacted] *See, e.g.*, Storms Decl. Exs. B, E, G, Mayo_Barton009292-97, 009614-25, 030996-031003. They are unquestionably private communications in the colloquial sense: the doctors exchanged them by text rather than publishing them to the world. But as discussed above, Rule 26(c) does not equate "private" with "confidential." The question is what legally cognizable interest requires the information itself to remain secret.

Defendants can offer none. These communications contain no proprietary research, competitive information, privileged legal advice, or other information whose value or legitimate purpose depends upon its secrecy. Rather, they [redacted]

[redacted] Indeed, it is palpably ironic that Defendants produced all of K.J.B.'s medical records – discussing her care and treatment at Mayo – without marking them as confidential, but then designated as confidential text messages [redacted].[44]

Mayo's [redacted] Storms Decl. Ex. N, Mayo_Barton009643. There cannot be any dispute here that [redacted]

[44] Plaintiff acknowledges she initially designated family text communications as confidential, as those communications concerned one of the most private and devastating moments of a family's life. Moreover, some of the messages were potentially subject to spousal or parent-child privileges, but Plaintiff nevertheless produced them without intending a wholesale waiver of any applicable privilege. Through the meet-and-confer process, Plaintiff agreed to de-designate the family text messages despite what Plaintiff believes is a far more compelling basis for confidentiality than Defendants have identified for the Mayo physicians' communications. Plaintiff simply asks that the same standard be applied to both sides.

[redacted] *See, e.g.*, Storms Decl. Exs. B, C, E, Mayo_Barton009290-92, 009295, 009463-67, 009615-16, 009618. In other words, [redacted].[45]

[redacted] Defendants' efforts to shield these documents appear to arise not from the secrecy of the information, but rather from [redacted]

As for the other category of messages, [redacted]

[45] [redacted]

[redacted]

January 2025 text messages are even further removed. [redacted]

What about these conversations is confidential? It can come as no surprise to Defendants that people often talk about past events or pending litigation, without every word uttered being shrouded in secrecy. Notably, [redacted]

[redacted], there is no evidence that they were generated through Mayo's peer-review or M&M process. *See* Minn. Stat. § 145.64. The fact that state law shields after-the-fact conversations made during a peer-review proceeding strongly suggests the messages involved here – which were *not* part of any such process – should enjoy no special protection.[46] And, although the messages [redacted]

Rule 26(c) does not give Defendants a confidentiality interest in such evidence merely because the conversations occurred privately. As noted, the Rule requires Defendants to identify an actual confidentiality interest in the information, not simply that the speakers did not expect their text messages eventually to become public – particularly when the patient herself agrees the information need not be shielded. *See In re Valsartan N-Nitrosodimethylamine (NDMA), Losartan & Irbesartan Prods. Liab. Litig.*, 512 F. Supp. 3d 546, 554 (D.N.J. 2021) ("Torrent argues its emails are

---

[46] Notably, Plaintiff has not identified a single paper or publication by a Mayo physician addressing K.J.B.'s case, despite the extensive publication histories of the physicians deposed in this matter. Nor has any involved physician testified to participating in a peer-review proceeding, M&M conference, or similar formal review concerning K.J.B.'s care. If Mayo's concern were truly preserving an environment in which physicians candidly examine adverse outcomes so that others may learn from them, one would expect some evidence that K.J.B.'s catastrophic outcome was actually subjected to such a process. There is none. Instead, the record reflects [redacted]. Whatever Mayo's reasons for preferring that these communications remain private, an asserted interest in institutional learning cannot justify confidentiality where there is no evidence that the communications were part of any formal learning, peer-review, or quality-improvement process.

'confidential' because this is what its clients expected. This is not an acceptable basis to justify the Confidential designation of a routine business communication."). Tellingly, during the meet-and-confer process preceding this Motion, Defendants offered to stipulate that Plaintiff could share the text messages with regulators or other medical providers. Meet & Confer Stmt. ¶ 6. But the fact Defendants were willing to stipulate to the messages' dissemination to *some* third parties – ones *Defendants* found acceptable – cannot be reconciled with their assertion the messages must remain confidential.

At bottom, the distinction between privacy and confidentiality ultimately resolves the issue for both categories of text messages. Some of the texts [redacted]

**B. The messages do not meet Rule 26(c)'s standards for protection**

There's more. Not only do the text messages fail to qualify as "confidential" under the Protective Order, but Defendants also cannot show their dissemination must be restricted in "order to protect [Defendants] from annoyance, embarrassment, oppression, or undue burden or expense," the guideposts of Rule 26(c)(1).

To be sure, one can easily see why Defendants would prefer [redacted]

But that simply is not enough: the possibility that disclosure might reflect poorly on Defendants cannot establish the good cause necessary for Rule 26(c) protection. It has been repeatedly recognized that the prospect of reputational harm or negative publicity is not, standing alone, good cause for restricting dissemination. *See, e.g.*, *In re Valsartan*, 512 F. Supp. 3d at 554 ("[I]t is not the case that merely because a document may be harmful, uncomfortable or embarrassing that a Confidentiality designation is appropriate."); *Culinary Foods, Inc. v. Raychem Corp.*, 151 F.R.D. 297, 301 (N.D. Ill. 1993) (explaining that "[a] claim that public disclosure of information will be harmful to a defendant's reputation is not 'good cause' for a protective order," and information that may be "embarrassing and incriminating" is not, for that reason, protected from

disclosure); *Welsh v. City & Cnty. of San Francisco*, 887 F. Supp. 1293, 1297 (N.D. Cal. 1995) ("[m]ere embarrassment by the release of information" not enough). Or as Judge Keyes once put it, "the purpose of entering a protective order is not to insulate a party from the annoyance, embarrassment, oppression, or burden that may be caused by having to defend claims of wrongdoing the details of which appear in materials produced during discovery." *Ameriprise Fin. Servs., Inc. v. Reserve Fund*, No. 08-5219, 2008 WL 11456114, *3 (D. Minn. Dec. 15, 2008). Rule 26(c)'s reference to "embarrassment" does not mean that a litigant may obtain confidentiality whenever discovery reveals facts that make the litigant look bad. Otherwise, evidence of misconduct would frequently qualify for protection for the very reason it is probative: because disclosure reflects adversely on the person who engaged in the conduct.

Defendants simply cannot establish good cause by asserting that public disclosure of the challenged communications may embarrass Mayo or its physicians, damage their reputations, or subject them to unwanted public scrutiny. If that were enough, virtually any damaging evidence produced in litigation could be shielded from disclosure. Rule 26(c) demands considerably more.

### C. Defendants' arguments for confidentiality fall flat

Defendants appear to recognize that their arguments for confidentiality do not fit neatly within Rule 26(c). This is perhaps why, during the meet-and-confer in connection with this Motion, defense counsel did not suggest embarrassment or annoyance as the reasons the text messages should be confidential. Meet & Confer Stmt. ¶ 8. Rather, two reasons were offered: a potential chilling effect on candid communications between

medical providers, and the potential impact of media attention and pretrial publicity. *Id.* ¶¶ 5-7.

These assertions, however, necessarily put the cart before the horse. The first step in the analysis must be whether the messages are in fact entitled to protection under Rule 26(c). Only if the Court makes that initial determination does the potential impact of removing de-designation factor into the analysis. *See, e.g.*, *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1313-15 (7th Cir. 2001); *Minter*, 2010 WL 5418910, at *8 (requiring party to "demonstrate that (1) the material in question is a trade secret or other confidential information within the scope of Rule 26(c) **and** (2) disclosure would cause identifiable harm") (bolding added) (citation omitted). Regardless, Defendants' contentions do not move the needle.

**1. The "chilling effect" arguments are unpersuasive**

At the outset, Defendants' chilling-effect argument suffers from a mismatch between the interest asserted and the documents at issue. Defendants contend that doctors need to communicate candidly while treating patients and for purposes of learning from one another (particularly for still-in-training surgical fellows such as Dr. Gagnet), and then claim that public disclosure might make them reluctant to have such candor. But a substantial portion of the challenged communications [redacted]

[redacted]

More fundamentally, Defendants' argument asks the Court to create something akin to a common-law privilege for candid physician communications. But if a generalized concern that disclosure will discourage candor is sufficient, then virtually any internal communication discussing questionable professional conduct could be protected on precisely the same theory. Hospitals could protect physicians' discussions of medical errors; corporations could protect employees' discussions of product defects; and government entities could protect officials' discussions of mistakes. That cannot be reconciled with *General Dynamics*'s requirement that the party seeking protection make a "particular and specific demonstration of fact," rather than rely upon "stereotyped and conclusory statements." 481 F.2d at 1212.

Rejecting Defendants' chilling-effect argument would hardly be novel. Indeed, Defendants are not the first in this District (or elsewhere) to attempt to shield discovery materials based on a putative chilling effect from their disclosure, but courts routinely cast a wary eye upon such claims. Consider *In re Baycol Products Litigation*, MDL No. 1431, 2003 WL 22023449 (D. Minn. Mar. 21, 2003). There, the defendant withheld from production certain documents based on a "self-analysis privilege," which was "premised upon the concern that disclosure of documents reflecting candid self-examination will

deter or suppress socially useful investigations and evaluations or compliance with the law or with professional standards." *Id.* at *5. *Baycol* rejected that argument, concluding – as had other courts – that "the argument that potential disclosure would discourage self-criticism is not compelling." *Id.* (citations omitted); *see also, e.g.*, *Bolger v. Dist. of Columbia*, Civ. No. 03-0906, 2006 WL 8448339, at *3-4 (D.D.C. Aug. 3, 2006); *McGee v. City of Chicago*, No. 04 C 6352, 2005 WL 3215558, at *4 (N.D. Ill. June 23, 2005).

Moreover, context is crucial, as explained in *Glinka v. Howard Bank, N.A. (In re Powell)*, Nos. 97-10274, 97-1085, 1998 WL 800110 (Bankr. D. Vt. Oct. 19, 1998). There, a bank sought to prevent public disclosure of internal audits and reviews that had been produced in discovery, arguing disclosure "would have a 'chilling effect' on the candid nature of the audits between Bank and its auditors." *Id.* at *1. The court disagreed:

> The candid relationship's foundation between Bank and its auditors rests upon sound business sense, not upon an evidentiary privilege. "We cooperate fully with Peat Marwick, not only because it makes good business sense, but because we want them to find any deficiencies or issues that exist in our system so that we can fully protect our depositors, our customers, and our shareholders." Affidavit of Richard J. Fitzpatrick, 2. We don't think that Bank will stop being candid (thereby acting contrary to its own "business sense") merely because the information is disclosed to the public, because such candidness is admittedly important to Bank's commercial success.

*Id.* The same reasoning applies with even greater force here. Mayo is a teaching hospital, and several of the physicians involved in K.J.B.'s care – including Drs. Gagnet and Chen – were receiving additional training through fellowship or residency programs. Candor among Mayo's physicians is therefore not some optional practice dependent upon an assurance of secrecy; it is essential both to the provision of competent medical care and to the teaching mission Mayo has chosen to undertake. Physicians must communicate

candidly about complications, unexpected outcomes, and potential mistakes because doing so is necessary to treat patients safely, to educate physicians in training, and to prevent errors from recurring. Those imperatives do not disappear merely because a physician's communications might later be disclosed in litigation. Plaintiff does not dispute the importance of physician candor, but she *does* dispute the unsupported premise that such candor depends upon perpetual secrecy.

By Defendants' logic, the more serious the complication – and thus the greater the need for candid discussion – the stronger the supposed claim to secrecy would become. Rule 26(c) creates no such categorical protection for ordinary physician communications. As in *Powell*, the need for candor arises from the very work the institution and its professionals are charged with performing, not from a promise that their communications will remain secret. *See also Kelly v. City of San Jose*, 114 F.R.D. 653, 664-66 (N.D. Cal. 1987) (rejecting notion that disclosure of internal-affairs investigations would tend to make officers less candid, explaining that the possibility of outside scrutiny in fact likely promotes candor rather than chills it, because people have greater incentive to be accurate and forthright when they know their statements may be tested by others, whereas complete secrecy may reduce that incentive by insulating statements from meaningful scrutiny); *King v. Conde*, 121 F.R.D. 180, 193 (E.D.N.Y. 1988) (Weinstein, J.) (recognizing that "fear of disclosure is more likely to increase candor than to chill it").

In any event, there is simply no reason to conclude that de-designation would prevent physicians from communicating candidly. Doing so would mean only that when doctors create relevant, nonprivileged evidence concerning a patient's care, Rule 26(c)

does not guarantee that evidence perpetual secrecy if the care later becomes the subject of litigation. Physicians already may be deposed about what they observed, what they said to one another, and why they made particular treatment decisions. Their medical records and other nonprivileged communications may likewise be discovered and used as evidence, or as the patient sees fit. No logical reason suggests text messages should receive special confidentiality unavailable to the same information when conveyed through other channels. Indeed, Defendants' argument is particularly difficult to square with the nature of the claims in this case. The very reason some of these communications matter is that physicians were candid. [redacted]. Defendants cannot transform the evidentiary value of that candor into the reason the evidence must remain confidential, perversely affording the greatest confidentiality to the most probative admissions.

At bottom, there has long been a presumption that "[t]he public … has a right to every man's evidence," *United States v. Bryan*, 339 U.S. 323, 331 (1950), and a "burden which litigants in our society must bear is that sometimes the public may learn of information which the litigant would rather the public not know," *Buergofol GmbH v. Omega Liner Co.*, 4:22-CV-04112, 2025 WL 1569624, at *4 (D.S.D. June 2, 2025)

(citation omitted). While Defendants "would rather the public not know" what their text messages conveyed, there exists no basis for their confidentiality.[47]

### 2. Speculation about media coverage cannot justify confidentiality

The meet-and-confer before this Motion was filed made clear Defendants' real concern with de-designation: Mayo's fear of unflattering media attention. Defense counsel recounted that there was press attention when this lawsuit was first filed, which Mayo apparently viewed as unfair and one-sided. Meet & Confer Stmt. ¶ 4. Defendants claim that de-designating the text messages will free Plaintiff to share them with the media, resulting in additional "unfair" media attention. *Id.* ¶ 5.

But Defendants' concerns are wholly speculative. While they are correct that the filing of this lawsuit initially generated modest media attention, that occurred almost two years ago and there has been none since, despite the fact the docket contains entries that might have generated media interest – such as that concerning the sudden "loss" of Dr. Karim's cell phone. *See* Dkt. No. 59. Despite this case now entering its second year of litigation, there is no evidence that any member of the media has attempted to attend a deposition or appear at any of the hearings or conferences with the Court. *See Morrow v. City of Tenaha*, No. 2-08-cv-288, 2010 WL 3927969, at *3 (E.D. Tex. Oct. 5, 2010) (declining to restrict dissemination of deposition transcripts marked confidential despite that "this case has garnered media attention and that one reporter attempted to attend the

[47] For all of the same reasons articulated above, no portion of a deposition transcript, expert report, or other derivative evidence discussing the text messages should be permitted to be designated confidential, either.

deposition of defendant Russell"). Any concerns about media attention are hypothetical and attenuated, not "particular and specific." *Gen. Dynamics*, 481 F.2d at 1212; *see also Bolger*, 2006 WL 8448339, at *3 (concluding there was no "reason to believe that the information would attract substantial public attention even if plaintiffs wanted it to be disseminated to a broad audience, given that the underlying events occurred more than five years ago" and had "previously…been publicized").

Putting this aside, one wonders what is unfair or one-sided about [redacted]. Indeed, it seems particularly ironic for Mayo to express concern that the words of its own people might be exposed to public scrutiny.

Defendants have indicated that media discussion of the text messages, were it to occur, would be unfair because (they claim) many of the messages would be inadmissible at trial. Meet & Confer Stmt. ¶ 6. There are a bevy of reasons Defendants' admissibility arguments do not hold water, including that the messages are non-hearsay statements of party opponents, *see* Fed. R. Evid. 801(d)(2), they may be offered not for their truth but rather for other purposes, such as the declarant's state of mind, *see* Fed. R. Evid. 801(c)(2), or that, even if hearsay, they are subject to several potential hearsay exceptions, *see* Fed. R. Evid. 803(1), (3). Regardless, the eventual admissibility *vel non* of the text messages has little to say about their continued confidentiality. *See Bolger*, 2006 WL 8448339, at *3 (declining to issue protective order limiting plaintiff's disclosure of materials produced by defendant, "[w]hether or not the materials ultimately

would be admissible evidence"); *see also Morrow*, 2010 WL 3927969, at *5 (refusing to restrict dissemination to media despite concern media members might "manipulate a defendant's testimony by producing, publishing, or otherwise disseminating mere excerpts of the deposition transcripts which would mislead the public").

Defendants have also expressed concern that media attention, should it happen, might eventually affect the jury pool. Meet & Confer Stmt. ¶ 6. But the Supreme Court has rejected the premise that public exposure to information concerning a case ordinarily prevents selection of a fair jury. "Prominence does not necessarily produce prejudice, and juror impartiality does not require ignorance." *Skilling v. United States*, 561 U.S. 358, 381 (2010) (cleaned up). Indeed, "pretrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial." *Id.* at 384 (citation omitted). A presumption that publicity has rendered a jury pool incapable of impartiality instead "attends only the extreme case." *Id.* at 381.

*Skilling* illustrates just how demanding this standard is. That criminal case arose from the collapse of Enron, an event that received enormous publicity and had profound effects throughout Houston. Yet the Court refused to presume prejudice, emphasizing among other things the size and diversity of the Houston metropolitan area, the nature of the information disseminated, the passage of time, and the availability of careful jury-selection procedures. *Id.* at 381-85. The Court further emphasized that voir dire is specifically equipped to address concerns about jurors' exposure to publicity, such as using questionnaires and individual questioning to identify prospective jurors whose prior knowledge or opinions prevents impartiality. *Id.* at 386-95.

The Eighth Circuit has applied these principles to extensive pretrial publicity in Minnesota. In *United States v. Petters*, 663 F.3d 375 (8th Cir. 2011), the defendant faced substantial Minneapolis-area reporting, including that he had confessed to fraud, had been secretly recorded making incriminating statements, had encouraged others to flee the country, and had been implicated by associates who pleaded guilty. *Id.* at 382-83. Relying on *Skilling*, the Eighth Circuit nevertheless reiterated that presumed prejudice from publicity is reserved for the "extreme case" and evaluated whether the actual jury-selection process revealed prejudice rather than simply assuming media coverage had poisoned the jury pool. *Id.* at 383-84. Ultimately the court rejected the assertion that Petters had failed to receive a fair trial for these reasons.

Defendants' concern here is several steps more removed than in *Skilling* or *Petters*. Defendants posit that de-designation *might* result in disclosure of some messages and *might* generate media coverage; prospective jurors *might* encounter that coverage; and those jurors *might*, at some future trial, be unable to set aside what they encountered. Stacking such hypotheticals one atop another will not suffice. *Gen. Dynamics*, 481 F.2d at 1212. Nor should the Protective Order be used as a substitute for the jury-selection process. *Skilling* makes clear that the ordinary response to pretrial publicity is to determine whether prospective jurors actually have been affected and, where necessary, employ questionnaires, individualized voir dire, and other measures designed to secure an impartial jury. 561 U.S. at 386-95. Defendants ask the Court to go considerably further by restricting Plaintiff's use of evidence before the supposed publicity even exists. That is particularly inappropriate because the Protective Order was entered to protect

legitimately confidential discovery, not to regulate what the public may learn about this litigation. Defendants cannot bootstrap a desire to avoid publicity into a confidentiality interest in information that is not otherwise confidential.

## IV. Why?

Lastly, Plaintiff pauses to address two questions she suspects the Court might be asking itself: *why* is de-designation needed? And why *now*?

Respectfully, the first question frames the analysis backwards. The question isn't why Plaintiff needs these messages to be public; it's why Defendants need them to remain confidential. The Protective Order permitted Defendants to designate the messages confidential in the first instance, but it also permitted Plaintiff to challenge those designations and placed the burden on Defendants to justify them under Rule 26(c). Defendants obtained the benefit of confidentiality at production without having to prove good cause document by document. They should now justify that confidentiality, rather than shifting the burden to Plaintiff to show otherwise.

There is also a more fundamental reason to resolve the issue. A confidentiality designation is not merely a label; it is a continuing restriction on what K.J.B. may do with information concerning [redacted]. Absent good cause for that restriction, Defendants should not retain the power to determine with whom K.J.B. may discuss the messages, for what purposes she may use them, or whether others may see them. And K.J.B. need not identify in advance every legitimate use she might someday make of the messages before challenging a restriction that Defendants cannot justify in the first place.

But there is also a practical answer to the "why" question. Because the Protective Order limits what may be done with documents marked confidential, it inherently "affects the parties' ability to litigate the matter." *Wright v. Capella Educ. Co.*, Case No. 18-cv-1062, 2020 WL 6285220, at *14 (D. Minn. Oct. 27, 2020). As an example, confidential documents may not be filed publicly with the Court, creating "unnecessary logistical restraints" for documents that deserve no protection. *In re ULLICO Inc. Litig.*, 237 F.R.D. 314, 318 (D.D.C. 2006). As *In re Valsartan* explained:

> Disputes regarding the over designation of Confidential documents is not harmless. These disputes result in substantial unnecessary distractions for the parties and the court. The disputes also consume substantial resources and time unrelated to the merits of the underlying dispute. In addition, over designation causes administrative headaches since parties have to be concerned about distribution limits as well as redactions and sealing requests.

512 F. Supp. 3d at 548 n.1 (citation omitted). In the absence of a valid justification for confidentiality, there is no reason the parties or the Court should be forced to undertake those problems.

This dovetails with the answer to the timing question. Plaintiff raised this issue several months earlier, but was instructed by the Court to wait until production was made after forensic inspection. While Dr. Karim's phone has still not been obtained and inspected, the nature of the text messages in this case is now well established and the case is approaching the point at which these communications will increasingly be used. The parties are proceeding into expert discovery, and confidentiality designations impose some constraints on the sharing of information in connection therewith. As the case progresses toward dispositive motions and trial, these communications are increasingly

likely to be used in briefing, as exhibits, and ultimately in open court. It makes little sense to postpone the issue and generate repeated disputes over sealing or confidentiality every time one of these messages is used. The logistical concerns highlighted above are therefore coming into sharper focus as the matter wends its way towards conclusion.

**Conclusion**

The Protective Order is a shield for genuinely confidential information, not a tool for keeping damaging evidence out of public view. Defendants cannot convert [redacted] into confidential information simply because they would rather those communications remain private. Rule 26(c) requires good cause, not a preference for secrecy, a showing Defendants cannot make. The confidentiality designations on the text messages should be removed.

Respectfully submitted,

**STORMS DWORAK LLC**

Dated: September 29, 2026

*/s/ Jeffrey S. Storms*
Jeffrey S. Storms (#387240)
Paul C. Dworak (#391070)
Marc E. Betinsky (#388414)
800 Hennepin Avenue
800 Pence Building
Minneapolis, MN 55403
Telephone: 612.455.7050
jeff@stormsdworak.com
paul@stormsdworak.com
marc@stormsdworak.com

- *and* -

**James G. Lowe, MD Law, LLC**
James G. Lowe, MD, JD
(PA# 329924) (pro hac vice)
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Jim@lowemdlaw.com

- *and* -

**Honkanen Law Firm, S.C.**
Erik J. Honkanen
U.S. Bank Plaza
230 1st St. South, Ste. 101
Virginia, MN 55792
Telephone: 218-749-3047
erik@honkanenlaw.com
**Attorneys for Plaintiff**